UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

SHANNON MARIE LEWIS,          )
                                            )
             Plaintiff,        )
                                            )
v.                                  )   Case No. 4:15 CV 1868 ACL
                                            )
NANCY A. BERRYHILL,[1]        )
Acting Commissioner of Social Security,    )
                                            )
             Defendant.     )

## <u>MEMORANDUM AND ORDER</u>

Plaintiff Shannon Lewis brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the Social Security Administration Commissioner's denial of her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act and Supplemental Security Income ("SSI") under Title XVI of the Act.

An Administrative Law Judge ("ALJ") found that, despite Lewis' severe impairments, she was not disabled as she had the residual functional capacity ("RFC") to perform jobs that exist in significant numbers in the national economy.

This matter is pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c). A summary of the entire record is presented in the parties' briefs and is repeated here only to the extent necessary.

For the following reasons, the matter is reversed and remanded for further proceedings.

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill is substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit.

# I.  Procedural History

Lewis protectively filed her applications for DIB and SSI on July 31, 2012.   (Tr. 17, 214-20, 221-26.)   She alleged that she became disabled on March 9, 2011, due to chronic erythema multiforme,[2] bipolar disorder, anxiety, panic, and irritable bowel syndrome ("IBS"). (Tr. 214-26, 275.)   Lewis' claims were denied initially.   (Tr. 130-31, 137-43.)   Following an administrative hearing, Lewis' claims were denied in a written opinion by an ALJ, dated June 4, 2014.   (Tr. 17-28.)   Lewis then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on November 18, 2015. (Tr. 6, 1-5.)   Thus, the decision of the ALJ stands as the final decision of the Commissioner.   *See* 20 C.F.R. §§ 404.981, 416.1481.

In the instant action, Lewis claims that the ALJ "failed to properly consider opinion evidence."   (Doc. 15 at 3.)

# II.  The ALJ's Determination

The ALJ stated that Lewis met the insured status requirements of the Social Security Act through December 31, 2016.   (Tr. 19.)   The ALJ found that Lewis had not engaged in substantial gainful activity since her alleged onset date of March 9, 2011.   *Id.*

In addition, the ALJ concluded that Lewis had the following severe impairments: depression and an anxiety disorder with panic attacks.   (Tr. 20.)   The ALJ found that Lewis did not have an impairment or combination of impairments that meets or equals in severity the requirements of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.   *Id.*

---

[2]An acute eruption of macules, papules, or subepidermal vesicles presenting a multiform appearance, the characteristic lesion being the target or iris lesion over the dorsal aspect of the hands and forearms.   *Stedman's Medical Dictionary*, 632 (28th Ed. 2006).

As to Lewis' RFC, the ALJ stated:

> After careful consideration of the entire record, the undersigned
> finds that the claimant has the residual functional capacity to
> perform a full range of work at all exertional levels but with the
> following nonexertional limitations: the claimant is able to perform
> very simple jobs, defined as work involving only one to two-step
> tasks. She must work in a job involving only occasional
> decision-making, no significant changes in the work setting,
> end-of-workday production quotas, and only occasional interaction
> with the public, co-workers and supervisors, with no performance of
> tandem tasks.

(Tr. 21.)

The ALJ found that Lewis' allegations regarding her limitations were not entirely credible.

(Tr. 26.) In determining Lewis' RFC, the ALJ indicated that she was assigning "some weight" to

the opinion of non-examining state agency psychiatrist, Lester Bland, Psy.D. (Tr. 24.) The ALJ

accorded "little weight" to the opinion of treating psychiatrist Jordan Balter, M.D. *Id.*

The ALJ further found that Lewis is unable to perform any past relevant work. (Tr. 26.)

The ALJ noted that a vocational expert testified that Lewis could perform jobs existing in

significant numbers in the national economy, such as silver wrapper, and hand trimmer. (Tr. 27.)

The ALJ therefore concluded that Lewis has not been under a disability, as defined in the Social

Security Act, from March 9, 2011, through the date of the decision. (Tr. 28.)

The ALJ's final decision reads as follows:

> Based on the application for a period of disability and disability
> insurance benefits filed on July 31, 2012, the claimant is not
> disabled under sections 216(i) and 223(d) of the Social Security Act.
>
> Based on the application for supplemental security income
> protectively field on July 31, 2012, the claimant is not disabled
> under section 1614(a)(3)(A) of the Social Security Act.

*Id.*

# III.   Applicable Law

## III.A.  Standard of Review

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole.   42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002).   Substantial evidence is less than a preponderance of the evidence, but enough that a reasonable person would find it adequate to support the conclusion.   *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001).   This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings."   *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted).   "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis."   *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.   The credibility findings made by the ALJ.

2.   The plaintiff's vocational factors.

3.   The medical evidence from treating and consulting physicians.

4.   The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.   Any corroboration by third parties of the plaintiff's impairments.

6.   The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted). The Court must also consider any evidence which fairly detracts from the Commissioner's decision. *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) (citing *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted). *See also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).

**III.B. Determination of Disability**

A disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. § 416.905. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience engage in any other kind of substantial gainful work which exists … in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the

regulations. 20 C.F.R. § 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon v. Barnhart*, 343 F.3d 602, 605 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 416.921(b). These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. *Id*. § 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141, 107 S.Ct. 2287, 2291 (1987). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience. 20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d); *see Kelley*

*v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's RFC to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 416.920(a)(4)(iv), 416.945(a)(4). "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *see* 20 C.F.R. § 416.945(a)(1). The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 416.945(a)(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. *Id.* § 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to prove that there is other work that the claimant can do, given the claimant's RFC as determined at Step Four, and his or her age, education, and work experience. *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n.5 (8th Cir. 2000). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. § 416.920(a)(4)(v). If the claimant can make an adjustment to other work that exists in significant

numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled. 20 C.F.R. §416.920(a)(4)(v). At Step Five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. *See* 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a(b)(2), 416.920a(b)(2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. *See* 20 C.F.R. §§ 404.1520a(b)(3), 416.920a(b)(3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. *See id.* Next, the Commissioner must determine the severity of the impairment based on those ratings. *See* 20 C.F.R. §§ 404.1520a(c), 416.920a(c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. *See* 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. *See id.* If there is a severe impairment, but the impairment does not meet or equal the listings, then the Commissioner must prepare an RFC assessment. *See* 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3).

## IV. Discussion

Lewis argues that the ALJ erred in evaluating the medical opinion evidence.   Specifically, Lewis contends that the ALJ failed to provide sufficient reasons for discrediting the opinion of treating psychiatrist Dr. Balter.[3]

Dr. Balter completed a "Physician's Assessment for Social Security Disability Claim" and "Mental Residual Functional Capacity Assessment" on April 19, 2014.   (Tr. 714-15.)   Dr. Balter expressed the opinion that Lewis had marked limitations in the following areas:   ability to maintain a work schedule and be consistently punctual; understand, remember and carry out detailed instructions and procedures; maintain adequate attention, concentration, and focus on work duties through a complete work day; complete a normal workweek without interruptions from psychologically based symptoms; interact appropriately with the general public or customers; work in coordination with or in close proximity to others; accept instructions and respond appropriately to criticism from supervisors or co-workers; respond appropriately to routine changes in the work setting; respond appropriately to routine work related stressors; demonstrate reliability in a work setting; and sustain extended periods of employment without decompensation from periodic exacerbation of psychiatric symptoms.   (Tr. 715.)   Dr. Balter found that Lewis would have moderate limitations in her ability to understand, remember and carry out simple work instructions and procedures; make appropriate simple work related decisions; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and maintain acceptable personal appearance and hygiene.   *Id.*

"'It is the ALJ's function to resolve conflicts among the various treating and examining physicians."   *Tindell v. Barnhart,* 444 F.3d 1002, 1005 (8th Cir. 2006) (quoting *Vandenboom v.*

---

[3]Although Lewis also alleged physical impairments, the ALJ found they were non-severe, and Lewis does not challenge this finding.   Thus, the undersigned will not discuss the medical evidence or the ALJ's findings regarding her physical impairments.

*Barnhart,* 421 F.3d 745, 749–50 (8th Cir. 2005) (internal marks omitted)). Opinions from medical sources who have treated a claimant typically receive more weight than opinions from one-time examiners or non-examining sources. *See* 20 C.F.R. § 416.927(c)(1)–(2). However, the rule is not absolute; a treating physician's opinion may be disregarded in favor of other opinions if it does not find support in the record. *See Casey*, 503 F.3d at 692. The treating physician's opinion should be given controlling weight when it is supported by medically acceptable laboratory and diagnostic techniques and it must be consistent with other substantial evidence in the case record. *Hacker v. Barnhart*, 459 F.3d 935, 937 (8th Cir. 2006). *See also* 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) (listing '[s]upportability' as a factor to be considered when weighing medical opinions). Inconsistencies may diminish or eliminate weight given to opinions. *Hacker*, 459 F.3d at 937. *See also Papesh v. Colvin*, 786 F.3d 1126, 1132 (8th Cir. 2015) (holding that a treating physician's opinion "may have 'limited weight if it provides conclusory statements only, or is inconsistent with the record'") (quoting *Samons v. Astrue,* 497 F.3d 813, 818 (8th Cir. 2007)). An ALJ "may discount or even disregard the opinion ... where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermines the credibility of such opinions." *Id.* (quoting *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015)).

If an ALJ declines to ascribe controlling weight to the treating physician's opinion, she must consider the following factors in determining the appropriate weight: length and frequency of the treatment relationship; nature and extent of the treatment relationship; evidence provided by the source in support of the opinion; consistency of the opinion with the record as a whole; and the source's level of specialization. 20 C.F.R. §§ 404.1527(c); 416.927(c). Whether the ALJ grants the treating physician's opinion substantial or little weight, "[t]he regulations require that the ALJ 'always give good reasons' for the weight afforded to a treating physician's evaluation." *Reed v.*

*Barnhart*, 399 F.3d 917, 921 (8th Cir. 2005). "Failure to provide good reasons for discrediting a treating physician's opinion is a ground for remand." *Reed v. Barnhart*, 399 F. Supp.2d 1187, 1194 (E.D. Mo. 2004).

The ALJ acknowledged that Dr. Balter was Lewis' treating psychiatrist, and that he treated Lewis from September of 2012 through April of 2014. (Tr. 24.) She stated that Dr. Balter's treatment notes are handwritten and "can be difficult to read." *Id.* The ALJ stated that the "legible portions" of Dr. Balter's treatment notes show that Lewis reported mood and anxiety problems, "however, these records also contained findings by Dr. Balter that the claimant had fair insight and judgment, no mood lability, a pleasant and only mildly anxious appearance, clear speech, adequate grooming, a bright affect, and decreased irritability and racing thoughts with treatment." *Id.*

The ALJ then provided the following explanation for the weight assigned to Dr. Balter's opinion:

> These findings are not consistent with the objective evidence in this case. Dr. Balter's own treatment records often indicated that the claimant has fair insight and judgment, was only mildly anxious, and had a bright affect with adequate grooming. Other treatment records contain no evidence of the claimant having a sloppy or improper appearance or an inability to maintain socially appropriate behavior. The claimant has gone significant periods with little treatment or reports of serious mental health problems, and has been found by both treating and non-treating sources to have only a moderate level of functional impairment. Accordingly, the undersigned finds that Dr. Balter's assessment is entitled to little weight.

*Id.*

Lewis contends that that the ALJ erred in discrediting Dr. Balter's opinion because it was supported by Dr. Balter's own treatment notes and the other evidence of record. Lewis further argues that the ALJ's finding that Lewis has gone for significant periods with little treatment or symptoms is erroneous. The undersigned agrees.

As the ALJ pointed out, portions of Dr. Balter's handwritten treatment notes are difficult to read. Dr. Balter's diagnoses as well as the majority of his findings on mental status examination, however, are legible. Dr. Balter's treatment notes are summarized as follows:

On June 22, 2012, Lewis complained of anxiety, panic, poor sleep, and poor concentration. (Tr. 432.) Lewis' medications at that time included Xanax[4] and Zoloft.[5] *Id.* Upon mental status examination, Dr. Balter noted that Lewis was tearful and labile, and her insight and judgment were fair. *Id.* Dr. Balter diagnosed Lewis with bipolar affective disorder ("BAD"), with a GAF score of 40.[6] On July 6, 2012, Lewis complained of mood swings and crying spells. (Tr. 431.) Lewis was tearful, labile, and her insight and judgment were fair. *Id.* Dr. Balter noted lability and "fair to limited" insight and judgment on July 27, 2012. (Tr. 430.) On August 24, 2012, Lewis complained of anxiety and crying spells. (Tr. 429.) Dr. Balter noted lability and fair insight and judgment. *Id.* Lewis complained of forgetfulness and distractibility on September 10, 2012. (Tr. 731.) Upon examination, Dr. Balter noted crying, lability, and distractibility. *Id.* Dr. Balter diagnosed Lewis with BAD and possible attention deficit disorder ("ADD"). *Id.* Dr. Balter adjusted Lewis' medications, and added Adderall.[7] *Id.* Dr. Balter noted that Lewis was "generally pleasant," and exhibited decreased lability on November 2, 2012, and December 14, 2012. (Tr. 730, 729.) In January 2013, Lewis reported feeling more

---

[4]Xanax is indicated for the treatment of anxiety and panic disorders. *See* WebMD, http://www.webmd.com/drugs (last visited March 9, 2017).

[5]Zoloft is indicated for the treatment of depression and anxiety. *See* WebMD, http://www.webmd.com/drugs (last visited March 9, 2017).

[6]A GAF score of 31-40 indicates some impairment in reality testing or communication (*e.g.,* speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (*e.g.,* depressed man avoids friends, neglects family, and is unable to work). *See American Psychiatric Ass'n., Diagnostic and Statistical Manual of Mental Disorders* 34 (Text Revision 4th ed. 2000) ("*DSM IV–TR*").

[7]Adderall is indicated for the treatment of ADHD. *See* WebMD, http:// www.webmd.com/drugs (last visited March 9, 2017).

depressed and was experiencing crying spells. (Tr. 728.) On February 25, 2013, Lewis reported feeling good generally. (Tr. 727.) Upon examination, Lewis was generally pleasant but mildly anxious, with no lability, and fair judgment and insight. *Id.* Dr. Balter increased Lewis' dosage of Adderall. *Id.* On March 25, 2013, Lewis reported problems with memory and concentration. (Tr. 726.) On examination, Lewis was labile, tearful, irritable, had crying spells and racing thoughts. *Id.* Dr. Balter diagnosed BAD, mixed, severe, worsening; ADD; and pseudobulbar affect.[8] *Id.* He adjusted Lewis' medications. *Id.* On April 29, 2013, Lewis reported feeling "really good." (Tr. 725.) Dr. Balter noted Lewis' affect was bright, she had decreased irritability and racing thoughts, and her grooming was adequate. (Tr. 725.) In May 2013, Dr. Balter noted crying spells, and a labile mood on examination. (Tr. 724.) He increased the dosage of Adderall. *Id.* On July 1, 2013, Lewis was labile, anxious, and tearful. (Tr. 723.) Dr. Balter increased her dosage of Topamax.[9] *Id.* In August of 2013, Lewis reported she was "not good," and reported mood swings and crying spells. (Tr. 722.) Her affect was tearful and labile, she was irritable, and her insight and judgment were fair to limited. *Id.* Dr. Balter increased Lewis' Topamax. *Id.* In September of 2013, Dr. Balter indicated that Lewis' affect was tearful and labile, with crying spells; she was anxious, sad, and overwhelmed; and her insight and judgment were fair-to-limited. (Tr. 721.) On December 2, 2013, Lewis reported doing "really good," and Dr. Balter assessed BAD, mixed, improving. (Tr. 720.) On January 16, 2014, Lewis reported being very scared and not wanting to be around people. (Tr. 719.) Upon examination, Lewis's affect was labile, tearful, and anxious; and her insight and judgment were fair-to-limited.

[8] The primary sign of pseudobulbar affect is frequent, involuntary and uncontrollable outbursts of crying or laughing that are exaggerated or not connected to one's emotional state. *See* Mayo Clinic, *Pseudobulbar affect*, http://www.mayoclinic.org/diseases-conditions/pseudobulbar-affect/symptoms-causes/dxc-20198593 (last visited March 9, 2017).
[9] Topamax is an anticonvulsant drug indicated for the treatment of seizures and migraine headaches. *See* WebMD, http:// www.webmd.com/drugs (last visited March 9, 2017).

*Id.* Dr. Balter assessed BAD, mixed, worsening. *Id.* Lewis reporting feeling "bad" on February 11, 2014. (Tr. 718.) Dr. Balter noted lability, crying, and anxiety. *Id.* He increased the dosages of her medications. *Id.* Lewis reported feeling "not good," on March 4, 2014, and Dr. Balter noted Lewis was tearful, had racing thoughts and anxiety, and limited insight and judgment. (Tr. 717.) He increased the dosage of Topamax. *Id.* On April 9, 2014, Lewis was anxious, tearful, irritable, and tangential. *Id.* Dr. Balter increased Lewis' dosage of Topamax again. *Id.*

Dr. Balter's treatment notes are supportive of his opinions. Dr. Balter diagnosed Lewis with BAD with a GAF of 40, which is indicative of major impairment in several areas, such as work or school. (Tr. 432.) As support for his April 2014 opinions, Dr. Balter cited Lewis' symptoms of mood lability, depressive symptoms, anxiety, irritability, and poor concentration. (Tr. 714.) In discrediting Dr. Balter's opinions, the ALJ stated that his treatment notes contained findings that Lewis had no mood lability, a pleasant and only mildly anxious appearance, bright affect, and decreased irritability and racing thoughts with treatment. (Tr. 24.) It is true that treatment notes from November and December of 2012 noted that Lewis was generally pleasant and exhibited decreased lability (Tr. 730, 729); in February of 2013, Lewis was generally pleasant and mildly anxious with no lability (Tr. 727); in April 2013, Lewis' affect was bright and she had decreased irritability and racing thoughts (Tr. 725); and in December 2013, Lewis reported doing "really good" and Dr. Balter indicated her BAD was "improving."

The ALJ did not discuss the fact that Dr. Balter noted increased symptoms subsequent to these visits, and on the majority of Lewis' visits. For example, on March 25, 2013, the month after Lewis reported feeling "good generally," Dr. Balter noted that she was labile, tearful, irritable, had crying spells, and racing thoughts. (Tr. 726.) He assessed BAD "severe, worsening." *Id.* Similarly, although Lewis reported feeling "really good" in April 2013, Dr.

Balter noted crying spells, and a labile mood in May 2013. (Tr. 725, 724.) Dr. Balter continued to note abnormalities in Lewis' mood and affect in July 2013, August 2013, and September 2013. (Tr. 723, 722, 721.) Although Dr. Balter assessed BAD, "improving" on December 2, 2013, his assessment changed to "BAD, mixed, worsening" the very next month due to findings of lability, tearfulness, anxiety, and fair-to-limited insight and judgment. (Tr. 719.) Dr. Balter continued to note abnormalities on examination in February 2014, March 2014, and April 2014. (Tr. 718, 717, 716.)

The ALJ cited only the small percentage of Dr. Balter's treatment notes that document improvement in Lewis' symptoms when finding Dr. Balter's treatment notes were not supportive of his opinions. On the majority of Lewis' visits, however, Dr. Balter noted abnormal findings such as a tearful or labile affect, anxiety, racing thoughts, or limited insight and judgment. Dr. Balter consistently adjusted and increased the dosages of Lewis' multiple psychotropic medications to treat her symptoms. Thus, Dr. Balter's opinions are consistent with his treatment notes.

The ALJ next found that Dr. Balter's opinions were inconsistent with the other medical evidence of record. The ALJ specifically noted that Lewis has gone for significant periods of time without treatment or reports of mental health problems, and has been found by "treating and non-treating sources" to have only a moderate level of functional impairment. (Tr. 24.) The ALJ acknowledged earlier in her opinion that Lewis' "primary care physician" had treated Lewis for mood disorders. (Tr. 22.) She found that, for "more than a year after the alleged onset date, the claimant did not have reported symptoms objective medical evidence, or treatment with the finding of severe psychological problems." *Id.*

The record reveals that, before Lewis began treating with Dr. Balter, she saw her primary care physician, Dr. Crawford, for treatment of her mental health impairments. In March of 2010,

Dr. Crawford indicated that Lewis had presented for management of BAD and anxiety. (Tr. 417.) He diagnosed Lewis with BAD, and acute anxiety, and prescribed Xanax. (Tr. 408.) On May 14, 2010, Dr. Lewis noted increased anxiety and depression on examination. (Tr. 410.) He diagnosed Lewis with BAD and chronic depression. *Id.* He adjusted Lewis' medications, and started her on Seroquel.[10] *Id.* In November 2010, Lewis saw Dr. Crawford for management of her BAD and chronic depression. (Tr. 403.) Dr. Crawford adjusted her medications. *Id.* Lewis complained of difficulty with focus and concentration on March 14, 2011. (Tr. 400.) Upon examination, Lewis was arduous and depressed. *Id.* Dr. Lewis assessed adult ADD. *Id.* On March 18, 2011, Dr. Crawford noted that Lewis was crying uncontrollably. (Tr. 399.) On March 22, 2011, Dr. Crawford noted that Lewis was in distress, and her mood was arduous and depressed. (Tr. 398.) Lewis complained of difficulty focusing on April 13, 2011. (Tr. 397.) Dr. Crawford noted anxiety on April 18, 2011. (Tr. 396.) On May 31, 2011, Lewis was depressed upon mental status examination. (Tr. 394.) On June 20, 2011, Lewis was "freaking out," reporting that she felt like something was going to happen, and she could not stop crying. (Tr. 391.) On July 12, 2011, Dr. Crawford found Lewis' mood was arduous on examination. (Tr. 388.) On September 6, 2011, Dr. Crawford noted that Lewis' mood was arduous and depressed on examination. (Tr. 384.) Lewis complained of difficulty focusing on October 11, 2011. (Tr. 382.) Dr. Crawford found Lewis was depressed on examination on October 18, 2011. (Tr. 381.) On November 15, 2011, Lewis' mood was arduous and depressed. (Tr. 380.) Dr. Crawford also noted anxiety and sleep problems. *Id.* Lewis was anxious and depressed on December 5, 2011. (Tr. 378.) Lewis was anxious on examination on December 28, 2011. (Tr. 375.) Her mood was arduous and depressed on June 5, 2012. (Tr. 374.)

---

[10]Seroquel is an anti-psychotic drug indicated for the treatment of mental disorders such as bipolar disorder. *See* WebMD, http:// www.webmd.com/drugs (last visited March 9, 2017).

Dr. Crawford's treatment notes reveal that Lewis consistently reported mental health symptoms and Dr. Crawford actively managed Lewis' mental impairments with medication adjustments from March 2010 until June 2012.   The evidence does not support the ALJ's finding that Lewis reported no symptoms for her mental impairments for more than a year after her alleged onset date.   Rather, Dr. Crawford's treatment notes reveal significant symptoms on mental status exam, and are not inconsistent with the opinions of Dr. Balter.

The remainder of the medical evidence is similarly consistent with Dr. Balter's opinions. Lewis was hospitalized at two different facilities from July 17, 2012, through July 21, 2012, for severe depression, suicidal ideation, and overdose.   (Tr. 479-89, 516.)   Lewis presented to the emergency room with self-inflicted cuts to her left arm.   (Tr. 516.)   She reported that her daughter was taken away by her father, which caused her to overdose with opioid medications. (Tr. 481.)   Upon discharge, Lewis was diagnosed with marijuana abuse, cocaine abuse, and major depressive disorder, with a GAF score of 46-50.[11]   (Tr. 480.)

After her discharge, Lewis continued to see Dr. Crawford.   (Tr. 372, 437-69.)   Lewis also attended counseling at Bridges Community Support Services from July 2012, through January 2013.   (Tr. 653-60.)   On August 15, 2012, Dr. Crawford noted Lewis was depressed, "very upset," and tearful.   (Tr. 372.)   Dr. Crawford continued to note symptoms of anxiety and depression throughout the end of 2012 and in the beginning of 2013.   (Tr. 455-69.)   On April 3, 2013, Lewis' mood was normal (Tr. 453), but on May 20, 2013, Dr. Crawford noted an abnormal mood.   (Tr. 450.)   On June 8, 2013, Dr. Crawford indicated that Lewis was in tears and had an aggressive attitude.   (Tr. 447.)   Dr. Crawford noted depression and "bipolar sleep disturbance" on July 2, 2013.   (Tr. 445.)   On August 1, 2013, Lewis complained of fatigue all the time and

---

[11]A GAF score of 41 to 50 indicates "serious symptoms" or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."   *DSM IV–TR* at 34.

difficulty sleeping.   (Tr. 441.)   Dr. Crawford noted Lewis was tearful on August 26, 2013.   (Tr. 439.)

Lewis started seeing Lisa Hawley, FNP, on August 7, 2013, for treatment of her various physical and mental complaints.   (Tr. 788.)   Ms. Hawley noted that Lewis was "anxious and in denial."   (Tr. 788.)   Upon examination, Ms. Hawley noted Lewis cried during the interview, was anxious, had poor insight, and exhibited poor judgment.   (Tr. 791-92.)   On August 21, 2013, Lewis was tearful, her mood was depressed, she was anxious, she had mood swings, her insight and judgment were poor, and her attention and concentration were poor.   (Tr. 786.)

On September 26, 2013, Lewis saw Angie Dockins, a Community Case Manager at BJC Behavioral Health, upon the referral of the Department of Mental Health.   (Tr. 644-48.)   Lewis' "life goal" was to "be able to work full time and be able to pay my bills again."   (Tr. 644.)   She reported depression, manic episodes, anxiety, panic attacks, difficulty concentrating, and occasional episodes of name calling and cursing.   *Id.*   Lewis was meeting with a case worker once a week at that time.   Ms. Dockins noted that the case worker helps Lewis complete paperwork (Tr. 645) and the case worker was present during the interview (Tr. 647).   Ms. Dockins stated that Lewis was extremely talkative and often had to be re-directed to stay on topic, and was extremely tearful and had difficulty making it through sensitive topics without crying.   (Tr. 647.) Ms. Dockins diagnosed Lewis with bipolar II disorder, and assessed a GAF score of 45.   *Id.*   She stated that Lewis' anxiety and depression were making it too difficult for Lewis to be effective during a job interview, despite her desire to work full-time.   *Id.*   Ms. Dockins recommended that, in the following year, Lewis work with her case worker to learn useful coping skills and problem solving skills for when her symptoms become "so severe."   *Id.*   Ms. Dockins noted that the case worker could help Lewis find a new psychiatrist due to Lewis' belief that her current psychiatrist was over-medicating her.   *Id.*   Ms. Dockins also suggested that Lewis consider vocational

rehabilitation along with working with her case worker on coping with her anxiety.  *Id.*  Ms. Dockins also recommended that Lewis continue counseling.  She concluded as follows:

> Without the continued support of the Adult CTT program, it's likely that [Lewis]'s symptoms will continue to become worse due to the fact that she may stop attempts at active problem solving.  At this point in time with her depression as severe as it is, it seems very unlikely that she could move forward on her own.  She will need added support from professionals.  Her current DLA is a 91, which reflects the need for high intense level of care.  She will benefit at first from having weekly visits to help her become stable and help to cope with her stressors.

*Id.*

On November 4, 2013, Lewis presented to S. Wahba, M.D., at Psych Care Consultants. (Tr. 665.)  Upon mental status examination, Dr. Wahba noted that Lewis was inappropriate, her mood was anxious, her speech was excessive and pressured, her thought process was circumstantial and tangential, she exhibited flight of ideas, and she had decreased concentration and judgment.  (Tr. 664.)  He diagnosed Lewis with BAD, somatization disorder, borderline personality disorder, history of ADD, and a GAF score of 60.[12]  *Id.*

Lewis saw David Shaw, M.D., Ms. Hawley's supervising provider, on November 7, 2013. (Tr. 774-77.)  Dr. Shaw noted that Lewis was a "rambling historian and it's not always clear all of her symptoms."  (Tr. 774.)  Upon examination, Dr. Shaw noted Lewis' insight and judgment were poor.  (Tr. 777.)  On December 9, 2013, Ms. Hawley noted that Lewis rambled about obtaining records, was anxious, her mood and affect were inappropriate, she was irritable, she had mood swings, her speech was pressured, and her insight and judgment were poor.  (Tr. 773.)  In January 2014, Ms. Hawley noted Lewis was anxious, had mood swings, her attention and concentration were poor, but her insight and judgment were normal.  (Tr. 768.)

---

[12]A GAF score of 51 to 60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  *See DSM IV-TR* at 34.

Lewis saw Peter Florian, MA, on January 21, 2014.  (Tr. 669-75.)  Mr. Florian noted that Lewis went from crying and stuttering to lucid and logical in one minute.  (Tr. 675.)  He diagnosed Lewis with bipolar I, severe borderline personality disorder, and a GAF score of 48 to 50.  (Tr. 676.)  Mr. Florian's plan was to help Lewis develop coping skills to "reduce roller coaster emotions and self-dramatizations and to develop more healthy reasons of getting reinforcements."  *Id.*

In a letter dated March 10, 2014, Tim Laughter, MA, of Christian Psychological and Family Services stated that he had been working with Lewis from August 29, 2012, through December 11, 2013, on approximately a weekly basis.  (Tr. 678.)  Mr. Laughter stated that Lewis has demonstrated significant difficulty focusing on a given topic, frequently interrupts conversation and gets sidetracked, has difficulty organizing her thoughts enough to effectively deal with issues she faces, and has significant difficulty with her ability to problem solve.  *Id.*  He stated that these symptoms have occasionally been significant enough to not only interfere with therapy, but that they had actually interrupted therapy.  *Id.*  Mr. Laughter stated that Lewis also suffers from anxiety with recurrent panic attacks, and that her anxiety is compounded by the symptoms of ADHD.  (Tr. 679.)  Mr. Laughter stated that Lewis' symptoms have made it extremely difficult for her to develop and maintain healthy social attachments, obtain and keep employment, and manage daily tasks and activities.  *Id.*  He indicated that Lewis seems to have self-terminated therapy after December 11, 2013.  *Id.*  Mr. Laughter indicated that Lewis' progress had been minimal-to-moderate, and that her prognosis was "somewhat unclear due to her limited ability to effectively engage in problem-solving."  *Id.*  Lewis also had barriers to obtaining appropriate medication and other confounding systemic factors, which limited the efficacy of treatment.  *Id.*  Mr. Laughter concluded that Lewis' limitations "may be significantly

mitigated given the successful resolution of confounding systemic factors and continued therapeutic treatment." *Id.*

Lewis saw Ms. Hawley on March 12, 2014, at which time Lewis was still tearful but stable. (Tr. 758.)   She was accompanied by her case worker.   (Tr. 762.)   Upon examination, Lewis was argumentative, her thoughts were scattered, she was anxious and irritable, had mood swings, her attention and concentration were poor, and her insight and judgment were normal.   (Tr. 762.)

The medical evidence discussed above reveals Lewis continued to exhibit significant symptomatology throughout the relevant period.   The ALJ's finding that "treating sources" have found only a moderate level of functional impairment is not supported by the record.   The ALJ cited the GAF score of 60 assessed by Dr. Wahba on November 4, 2013.   (Tr. 23, 662.) Although a GAF score of 60 is associated with moderate symptoms, Dr. Wahba noted significant symptoms on mental status examination.   Specifically, Dr. Wahba noted Lewis was inappropriate, anxious, her speech was excessive and pressured, her thought process was circumstantial and tangential, she exhibited flight of ideas, and her concentration and judgment were decreased.   (Tr. 663-64.)   In addition, Dr. Wahba saw Lewis on only one occasion.   The other examining mental health providers consistently noted GAF scores in the 40 to 50 range. (Tr. 432, 480, 647, 676.)

The ALJ erred in discrediting Dr. Balter's opinion.   Dr. Balter was Lewis' treating psychiatrist from September of 2012 through April of 2014.   As such, Dr. Balter was the most qualified source to provide a longitudinal opinion of Lewis' psychiatric functioning.   Dr. Balter's opinion is supported by his treatment notes, which reveal Lewis continued to exhibit significant psychiatric symptoms even through periods of regular treatment and improvement.   The other evidence of record is also consistent with Dr. Balter's opinions.   Lewis received regular treatment for her mental impairments from primary care providers Dr. Crawford and Ms. Hawley, and

multiple counselors. She also received frequent assistance from case workers. These providers consistently noted abnormalities in Lewis' mood, attention, and judgment on mental status examination. The ALJ, therefore, failed to provide sufficient reasons for discrediting Dr. Balter's opinion.

Lewis also argues that the ALJ erred in assigning weight to the opinion of non-examining state agency psychologist Lester Bland, Psy.D. On October 17, 2012, Dr. Bland expressed the opinion that Lewis had moderate limitations in her activities of daily living, ability to maintain social functioning, and ability to maintain concentration, persistence or pace. (Tr. 110.)

The ALJ indicated she was assigning "some weight" to the opinion of non-examining state agency psychologist Lester Bland, Psy.D. (Tr. 24.) The ALJ indicated that Dr. Bland's opinions were consistent with the medical records, which showed Lewis' conditions were stable and that she only reported occasional serious symptoms often coinciding with a particular psychological stressor. Contrary to the ALJ's finding, however, the evidence of record does not show Lewis' conditions were stable. Thus, the ALJ did not provide good reasons for assigning weight to the opinion of Dr. Bland.

When determining a plaintiff's RFC, an ALJ must consider "all relevant evidence," but ultimately, the determination of the plaintiff's RFC is a medical question. *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001). As such, the determination of plaintiff's ability to function in the workplace must be based on some medical evidence. *Id.*; *see also Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000). When determining the RFC, "'[t]he opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence.'" *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) (quoting *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998)).

The RFC formulated by the ALJ is not supported by substantial evidence. As previously

discussed, the ALJ erred in discrediting the opinion of treating psychiatrist Dr. Balter.   The ALJ then failed to provide sufficient reasons for assigning weight to the opinions of state agency psychologist Dr. Bland.   Due to the ALJ's errors in evaluating the medical opinion evidence, she failed to incorporate sufficient limitations in Lewis' RFC.

For the reasons discussed above, the Commissioner's decision is not based upon substantial evidence on the record as a whole and the cause is therefore remanded to the Commissioner for further consideration in accordance with this Memorandum and Order.   Upon remand, the ALJ shall properly consider the opinion evidence, and formulate a new mental RFC based on the record as a whole.

Dated:   <u>March 30, 2017</u>

ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE